IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SFP FRANCHISE CORPORATION, *et al.*,[1] | Case No. 20-10134 (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF CRAIG M. BOUCHER IN SUPPORT OF THE
DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Craig M. Boucher, hereby declare as follows:

1. I am the Co-Chief Restructuring Officer of SFP Franchise Corporation ("SFP Franchise") and its affiliated debtor Schurman Fine Papers ("SFP" and together with SFP Franchise, the "Company" or the "Debtors"), as debtors-in-possession. Along with my colleagues at Mackinac Partners, I started providing financial advisory services to the Company in November 2019 and joined its management team as Co-Chief Restructuring Officer in January 2020. In these capacities, I have become and am familiar with the Debtor's businesses, day-to-day operations and financial affairs.

2. On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 (the "Chapter 11 Cases") of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended or modified, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court") and filed various motions described herein requesting certain relief in connection with the Chapter 11 Cases (collectively, the "First Day Pleadings"). I submit this declaration (the "Declaration") in support of the Debtors' Chapter

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: SFP Franchise Corporation (6248); and Schurman Fine Papers (1409). The location of the Debtors' principal place of business is 300 Oak Bluff Lane, Goodlettsville, Tennessee 37072.

{1270.001-W0059686.6}

11 Cases and the First Day Pleadings.

3. Except as otherwise indicated herein, all statements set forth in this Declaration are based upon (a) my personal knowledge gained in my capacity as an officer of the Company, (b) information supplied to me by employees under my supervision or members of the Company's management team, (c) my review of relevant documents, and/or (d) my experience and knowledge of the Company's operations and financial affairs. I am authorized by the Debtors to submit this Declaration and, if called upon to testify, I could and would testify to the facts set forth herein.

4. Part I of this Declaration describes the Debtors' businesses, Part II describes the circumstances giving rise to the commencement of these Chapter 11 Cases, Part III describes the Debtors' proposed course for these Chapter 11 Cases, and Part IV sets forth certain facts in support of the First Day Pleadings.

I.

**OVERVIEW OF THE DEBTORS' BUSINESSES**

**Business Operations**

### A. Origin and Historical Operations

5. Schurman Retail Group was founded in 1950 as an importer and wholesaler of fine greeting cards and stationery. The company was founded on the principle that there was a distinct market in the United States for greeting cards and stationery that intersected with the world of fine art. From that guiding principle, the company grew over the years through wholesale, franchise, retail and on line channels. The first Papyrus store was opened in 1973 in Berkeley, California. Today, the company operates Papyrus, Paper Destiny and American Greetings/Carlton Cards retail stores.

6. Between 1950 and 2009, the Company steadily grew from a wholesale greeting card and stationery business to a full-fledged retail concern. Beginning in the early 1980's, the

Company's leadership transitioned from the original founders to their daughter and current chief executive officer, Dominique Schurman. During that time, the Company expanded rapidly, founding SFP Franchise Corporation for the purpose of franchising the Papyrus brand retail operation and augmenting the Company's wholesale distribution channels.

7. The Company's rapid expansion, including the re-purchase of franchises, led to a period of over-leverage during the 2008-2009 financial crisis that resulted in financial and operational distress for the Company. During that time, the Company sought a strategic and/or financial partner to effectuate a restructuring.

8. In April 2009, the Company entered into a transaction with American Greetings Corporation and its affiliates ("American Greetings") that fundamentally transformed the Company's business. Under a Purchase and Sale Agreement dated April 17, 2009 (the "Sale Agreement"), the Company sold its wholesale business and the Papyrus brand and related trademarks to American Greetings. At the same time, the Company acquired the retail business previously operated by American Greetings in Canada and the United States. As a result of this transformation, the Company became the retail operator of over 500 stores in both the United States and Canada.

9. In conjunction with the Sale Agreement, the Debtors and American Greetings entered into several ancillary agreements (collectively, the "American Greeting Agreements", including:

    a.    A Supply Agreement dated April 17, 2009 (the "Supply Agreement") under which American Greetings is the predominant supplier of products sold by the Debtors in their retail stores, for an initial term of 7 years.

    b.    The Amended and Restated Trademark License Agreement made as of April 17, 2009 (as amended, the "Trademark Agreement") for an initial period of 10 years under which American Greetings and its affiliates agreed to provide a royalty-free license to the Debtors for the trademarks (including the Papyrus mark) under which the Debtors' stores operate and that are featured on most of its products

(the "Trademarks").

c.  The Marketing Services Agreement between American Greetings and the Debtors (as amended, the "Marketing Agreement") under which the Debtors agreed to provide American Greetings with certain marketing services in exchange for a monthly service fee, with an initial term of 7 years.

d.  The POS Data Services Agreement between American Greetings and the Debtors (as amended, the "POS Agreement") under which the Debtors agreed to collect and provide point-of-sale data to American Greetings in exchange for a monthly service fee, with an initial term of 7 years.

10.  As a result of these agreements, the Company became increasingly integrated with and highly dependent on American Greetings. In particular, the Company relied on American Greetings for significant portions of the goods it sold under the *Papyrus* and *Carlton Cards / Cartes Carlton* names and for the trademarks it required to operate its business under the *Papyrus* and *Carlton Cards / Cartes Carlton* names.

**B.  Current Business Operations**

11.  As of the Petition Date, the Company owns and operates 254 retail stores in the United States and Canada and is headquartered in Goodlettsville, Tennessee.

12.  The Debtors own and operate 178 retail stores in twenty-seven (27) states and the District of Columbia (Arizona, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Illinois, Indiana, Massachusetts, Maryland, Maine, Michigan, Minnesota, Missouri, North Carolina, New Hampshire, Nevada, New Jersey, New York, Ohio, Oregon, Pennsylvania, Texas, Utah, Virginia, and Washington) as depicted below.



13. The Debtors' Canadian subsidiary, SFP Canada, Ltd. ("SFP Canada"), also owns and operate seventy-six (76) retail stores in eight (8) provinces in Canada (Alberta, British Columbia, Manitoba, Newfoundland, Nova Scotia, Ontario, Quebec, and Saskatchewan) as depicted below.



14. The Company operates retail locations under four (4) brands: Papyrus, American Greetings, Carlton Card and Paper Destiny. The Trademarks used in the Papyrus, American Greetings and Carlton Card retail locations were licensed from American Greetings pursuant to the Trademark Agreement. The Debtors own four of their own brands: Paper Destiny, Marcel Schurman, NIQUEA.D and XOXO, Dominique.

15. The Company's Papyrus retail locations are leaders in delivering consumers carefully curated greeting cards, stationery and gifts, among other items, which are all curated to reflect the Company's roots and passion for fine art and commitment to only the finest quality materials. The Company's Paper Destiny retail locations offer consumers greeting cards, stationery and gifts. The Company's American Greetings and Carlton Cards retail locations feature an extensive collection of high-quality products available at an attractive value for consumers. The Company also has the Niquea.D brand, featuring fashion focused on timeless glamour and imagination with influences from the past. The Company no longer has any stand-alone Niquea.D retail locations, but items from the brand (as well as Marcel Schurman and XOXO, Dominique) are available online and in the Company's other retail locations. The Debtors also operate an e-commerce platform based from their website https://www.papyrusonline.com/.

 

16. As of the Petition Date, the Debtors have approximately 1,100 salaried and hourly employees (in the U.S.), the vast majority of whom work in the Company's retail locations and are employed by, and on the payroll of, debtor Schurman Fine Papers. The Company has no unionized employees and is not party to any collective bargaining agreements. On a consolidated

basis, the Debtors reported $157.5 million in revenues for fiscal year 2019 and generated EBITDA of $700,000 for that same period.

**Corporate Structure**

17.   The Company's organizational structure as of the Petition Date is set forth on **Exhibit A** attached hereto (the "Organizational Chart"). SFP is the Debtors' main operating entity, employing and paying substantially all of the Debtors' employees, contracting with vendors and operating the Debtor's retail locations and online retail portals. SFP Franchise and SFP Canada are wholly owned affiliates of SFP.

**Capital Structure**

18.   As of the Petition Date, the Debtors have assets totaling approximately $39.4 million and consolidated outstanding liabilities totaling approximately $54.9 million, consisting primarily of secured and unsecured obligations described further below.

*Secured Debt*

19.   Pursuant to the First Amended & Restated Loan and Security Agreement, dated April 17, 2009, by and among the Debtors, Wells Fargo Bank, National Association, in its capacities as administrative agent and collateral agent (in such capacities, "Senior Agent"), and the lenders party thereto (the "Senior Lenders") (as amended from time to time prior to the Petition Date, collectively, the "Senior Loan Agreement"), the Senior Agent and Senior Lenders provided a revolving credit facility in the maximum principal amount of $35,000,000 to the Debtors. As of the Petition Date, the Debtors are indebted and liable to the Senior Agent and Senior Lenders under the Senior Loan Documents in an aggregate principal amount not less than $6,675,159.85, consisting of Advances (as defined in the Senior Loan Agreement) in the aggregate principal amount of $6,625,159.85 and Letters of Credit (as defined in the Senior Loan

Agreement) in the aggregate undrawn face amount of $50,000.00, plus all interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and all other Obligations (as defined in the Senior Loan Agreement) accrued, accruing or chargeable in respect thereof or in addition thereto (collectively, the "Senior Prepetition Obligations"). Pursuant to the Senior Loan Agreement and other Senior Loan Documents, each Debtor granted senior liens upon and security interests in substantially all of such Debtor's assets (collectively, the "Senior Prepetition Collateral") to the Senior Agent for the benefit of itself and the Senior Lenders as security for the Obligations (as defined in the Senior Loan Agreement) (collectively, the "Senior Prepetition Liens").

20. In addition to the Senior Prepetition Collateral, the Senior Agent is the beneficiary under that certain Letter of Credit No. 12500046-00-000 in the face amount of $10,000,000 issued by PNC Bank, National Association on behalf of the American Greetings Corporation, which Letter of Credit is governed by that certain Limited Guaranty, dated as of April 17, 2009 (as amended from time to time prior to the Petition Date), made by American Greetings in favor of the Senior Agent.

21. On June 25, 2019, the Debtors, SFP Canada and American Greetings entered into a Security Agreement (the "Junior Security Agreement") pursuant to which the Debtors and SFP Canada granted a security interest over their present and after-acquired property to secure the obligations owing under the Supply Agreement, the Trademark License Agreement, the POS Data Services Agreement, the Marketing Services Agreement, the American Greetings Guarantee, and any other documents, purchase orders, or other agreements between the Debtors and American Greetings, all subject to the Subordination Agreement (as defined below). As of the Petition Date, the Debtors owe not less than $38,706,673.00 for amounts that have accrued

under the American Greetings Agreements.

22. The Senior Agent and (i) American Greetings, (ii) Carlton Cards Limited and (iii) Papyrus-Recycled Greetings Canada Ltd. are parties to that certain Subordination and Intercreditor Agreement dated as of June 25, 2019 (as amended from time to time prior to the Petition Date, collectively, the "Subordination Agreement"). The Subordination Agreement, among other things, (A) confirms the senior priority of the security interests of the Senior Agent in the Senior Prepetition Collateral to the junior priority security interests of American Greetings in the Senior Prepetition Collateral, which junior priority security interests were granted by the Debtors to American Greetings pursuant to the terms and conditions of the Junior Security Agreement, (B) provides that American Greetings shall be deemed to have consented to the use of cash collateral by the Debtors upon notice of the Senior Agent's consent to such use of cash collateral and (C) provides certain other rights and obligations between the Senior Agent, on the one hand, and American Greetings, on the other hand, relating to the Senior Prepetition Collateral.

*Unsecured Debt*

23. As of the Petition Date, the Debtors estimate that their unsecured debt aggregates approximately $8 million, consisting primarily of trade related debt.

*Equity*

24. As set forth on the Organizational Chart, Schurman Fine Papers directly owns both SFP Franchise Corp. and SFP Canada, Ltd. SFP is privately held and has three (3) known equity holders, the majority of which is owned by the Debtors' chief executive officer, Dominique Schurman.

## II.

## **EVENTS LEADING TO THESE CHAPTER 11 CASES**

25.     In addition to the general downturn in the brick-and-mortar retail industry, the Debtors have suffered an erosion in their profitability due to unique operational and performance issues including (a) the capital costs incurred in refurbishing or closing a large number of old and underperforming stores acquired in 2009; (b) the renegotiation of certain agreements which reduced the fees payable to the Debtors under those agreements; and (c) increased cost of products and pricing issues for products in both the United States and Canada that resulted in a decline in revenues.

26.     Over the past twenty-four months, the Debtors have taken a number of steps to attempt to address the operational and liquidity issues they have faced, including negotiating with vendors to obtain credit or more favorable terms for a supply of services, engaging in discussions with its landlords to obtain various forms of rent relief and pursuing negotiations with certain parties in connection with the sale of equity in the Debtors.

27.     The Debtors and American Greetings worked cooperatively to address the operational and financial issues facing the Debtors and find a mutually beneficial path forward. In early 2019, the Company's management approached American Greetings to address the receivable owing to American Greetings and provide greater security on a go forward basis. To that end, pursuant to the Junior Security Agreement, the Debtors agreed to give security to American Greetings in the property of the Debtors, which security was to rank subordinate to the security held by the Senior Lenders.

28.     During fall 2019, the Debtors also actively engaged with potential strategic partners to sell and/or re-capitalize the Debtors balance sheet. However, before the Debtors were able to consummate a transaction or otherwise identify a viable path forward, on December 5,

2019, American Greetings notified the Debtors that it was immediately terminating the American Greetings Agreements, subject to a cure period, purportedly on the basis that the Debtors were in default under those agreements. American Greetings ceased providing product to the Debtors at the same time, which had an immediate negative impact on the Debtors' business operations.

29. In the days and weeks following the December 5, 2019 termination of the American Greetings Agreements, the Debtors, with the assistance of its financial and legal advisors, engaged in discussions with American Greetings in an attempt to address the concerns raised by American Greetings and cure the alleged defaults under the American Greetings Agreements. Despite the best efforts of the Debtors' management and advisors, the discussions with American Greetings failed to lead to an executable out-of-court transaction.

30. The termination of the American Greetings Agreements by American Greetings constituted events of default under the Senior Loan Agreement. As a result, the Senior Lenders have the right to cease making any advances and to cease issuing any additional letters of credit to the Debtors, to demand immediate payment of all outstanding obligations under the Senior Loan Agreement and to exercise the rights and remedies available to the Senior Lenders, including foreclosure upon any collateral securing the outstanding obligations. While the Senior Lenders have not chosen to exercise any of these rights or remedies, it has expressly reserved all rights and remedies under the Senior Loan Agreement.

31. Ultimately, following its evaluation of all available options, the Company determined that filing for Chapter 11 protection, utilizing cash collateral (with the consent of the Senior Agent, Senior Lenders and American Greetings, in its capacity as Subordinated Creditor) and pursuing an orderly liquidation of its assets in a controlled, court-supervised environment (the "<u>Liquidation</u>") is the best available option to maximize value for the Company and its

stakeholders. The Debtors believe that the Chapter 11 process, including the proposed Liquidation, consisting of substantially all of their assets, will provide the greatest recovery for their creditors.

**GOB Liquidation and Cash Collateral**

32. Prior to the Petition Date, the Debtors solicited bids from four (4) leading national liquidation firms. To initiate the closing of Debtors' store locations in the United States (the "Store Closings"), the Debtors entered into the consultant agreement dated as of January 17, 2020, (the "Consulting Agreement") by and between the Debtors (the "Merchant"), and a joint venture with Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC (together, the "Consultant"). The Debtors intend to utilize the services of the Consultant to liquidate all of their remaining inventory and close all of their stores.

33. The Debtors believe, in the exercise of their business judgment, that the Liquidation will provide the best process under the circumstances to maximize value for all of their stakeholders. Indeed, given that the Debtors have limited financing options other than utilizing Cash Collateral (described below), the only alternative to selling the Company's assets in the Liquidation would be conversion to Chapter 7 and a trustee conducted liquidation. In the Debtors' business judgment, a Chapter 7 trustee conducted liquidation would be exceedingly value destructive, as the Debtors would immediately lose a significant portion of the potential retail value of its assets, over a thousand jobs would be immediately eliminated and assets would be monetized for only marginal, wholesale amounts.

34. In order to ensure that they have sufficient funds to maintain the stability of their businesses throughout the completion of the proposed Liquidation, the Debtors will utilize cash collateral, having obtained consent from the Senior Lenders and American Greetings to utilize

their cash collateral during the Chapter 11 Cases (the "Cash Collateral"), as set forth in the Cash Collateral Motion (defined below). In the exercise of their business judgment, the Debtors have determined that Cash Collateral is the best, and only, means of financing the proposed Liquidation and that Cash Collateral will provide them with the liquidity they require to operate in these Chapter 11 Cases.

### III.

### PROPOSED COURSE OF THE CHAPTER 11 CASES

35. The Debtors intend to pursue the Liquidation in order to obtain maximum value for their assets for the benefit of all of their stakeholders, including their employees and creditors. Consensual use of Cash Collateral will provide the Debtors with sufficient liquidity to operate during the Liquidation process, with revenue from the going-out-of-business sales projected to be sufficient to support continued operations and the administrative expenses of these Chapter 11 Cases, as well as reduce the balance owed to the Senior Lenders under the Senior Loan Agreement. Contemporaneously herewith, a Companies' Creditors Arrangement Act ("CCAA") proceeding has been commenced in Canada relating to the Debtors' Canadian subsidiary, SFP Canada.

36. In order to achieve their goals in Chapter 11, the Debtors seek the relief set forth in the First Day Motions, as defined and summarized below.

### IV.

### FACTS IN SUPPORT OF FIRST DAY PLEADINGS[2]

37. To minimize the adverse effects of the commencement of these Chapter 11 Cases on the Debtors' ability to effectuate a timely and efficient Chapter 11 Liquidation that will

---

[2] Capitalized terms not defined within this Section IV shall have the meaning ascribed to such terms in the respective First Day Motions.

maximize the value of the Debtors' estates, the Debtors have filed the following motions (the "First Day Motions"):

- Motion of the Debtors for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases;

- Debtors' Application for Authorization to Employ and Retain Omni Agent Solutions as Claims and Noticing Agent Effective *Nunc Pro Tunc* to the Petition Date;

- Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (B) Authorizing the Continued Use of Existing Cash Management System and (C) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(b) and the United States Trustee Operating Guidelines;

- Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Wages, Compensation, Employee Benefits and Other Associated Obligations;

- Motion of the Debtors for Entry of Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance and (C) Establishing Procedures for Determining Adequate Assurance of Payment;

- Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Tax and Fee Obligations and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers;

- Motion of the Debtors for Interim and Final Orders Authorizing the Debtors to (I) Maintain Existing Insurance Policies and Pay All Policy Premiums Arising Thereunder and Renew or Enter into New Policies and (II) Continue Insurance Premium Financing Programs, Pay Insurance Premium Financing Obligations Arising in Connection Therewith and Renew or Enter into New Premium Financing Arrangements;

- Motion of the Debtors Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief;

- Debtors' Motion for Interim and Final Orders (I) Authorizing Use of Cash Collateral; (II) Modifying the Automatic Stay; and (III) Granting Related Relief;

- Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consultant Agreement, (II) Approving Procedures for Store Closing Sales, (III) Approving the Implementation of Customary Store Bonus Program and Payments to Non-Insiders Thereunder, and (IV) Granting Related Relief; and

- Motion of the Debtors for Entry of an Order Authorizing Debtors to Pay Certain Prepetition Shipper and Common Carrier Obligations.

38. I have reviewed each of the First Day Motions, including any exhibits thereto, and the statements and facts set forth in each of the First Day Motions are true and correct to the best of my knowledge. I hereby incorporate by reference each of the factual statements set forth in the First Day Motions. These First Day Motions seek authority to, among other things, obtain authority to use cash collateral on an interim basis, honor employee-related wages and benefit obligations and ensure the continuation of the Debtors' cash management systems and other business operations without interruption. I believe that the relief requested in the First Day Motions is necessary to prevent irreparable harm and to give the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors' stakeholders.

39. Several of these motions request authority to pay certain prepetition claims. I understand that rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one (21) days following the filing of a chapter 11 petition, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

40. In sum, I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of value; (b) is necessary to provide the Debtors with a reasonable opportunity for a successful Liquidation; (c) is necessary to avoid immediate and irreparable harm; and (d) best serves the interests of the Debtors' stakeholders.

## DECLARATION

41. Pursuant to section 1746 of title 28 of the United States Code, I declare under penalty of perjury that the foregoing is true and correct.

## RELIEF REQUESTED

42. I respectfully request that the Court grant all relief requested in the First Day Pleadings and such other and further relief as may be just and proper.

Dated: January 23, 2020             SFP Franchise Corporation
Schurman Fine Papers

*/s/ Craig M. Boucher*
Craig M. Boucher
Co-Chief Restructuring Officer

# **EXHIBIT A**

# SFP Franchise Corporation and Schurman Fine Papers[1]
## Corporate Structure

**Schurman Fine Papers**
California Corporation

**SFP Franchise Corporation**
Delaware Corporation

**SFP Canada LTD**
Canadian Corporation

---

[1] Concurrent to these Chapter 11 Cases, a separate proceeding in Canada under the CCAA is proceeding for the Debtors' Canadian affiliate.