**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SFP FRANCHISE CORPORATION, *et al.*,[1] | Case No. 20-10134 (JTD) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR**
**ENTRY OF INTERIM AND FINAL**
**ORDERS (I) AUTHORIZING THE DEBTORS**
**TO ASSUME THE CONSULTING AGREEMENT,**
**(II) APPROVING PROCEDURES FOR STORE CLOSING**
**SALES, (III) APPROVING THE IMPLEMENTATION OF**
**CUSTOMARY STORE BONUS PROGRAM AND PAYMENTS TO**
**NON-INSIDERS THEREUNDER, AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") by and through their proposed undersigned counsel hereby submit the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, (III) Approving the Implementation of Customary Store Bonus Program and Payments to Non-Insiders Thereunder, and (IV) Granting Related Relief* (the "Motion"). In support of the Motion, the Debtors submit the *Declaration of Craig M. Boucher in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"),[2] filed contemporaneously with this Motion, and respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: SFP Franchise Corporation (6248); and Schurman Fine Papers (1409). The location of the Debtors' principal place of business is 300 Oak Bluff Lane, Goodlettsville, Tennessee 37072.

[2] Capitalized terms used but not otherwise defined in this Motion shall have the same meanings ascribed to such terms as in the First Day Declaration.

## JURISDICTION AND VENUE

1.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012 (the "Amended Standing Order").   This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).   The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The legal bases for the relief requested herein are sections 105, 363, 365 and 554 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002, 6003, and 6004, and Bankruptcy Local Rule 9013-1(m).

## GENERAL BACKGROUND

4.     On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (these "Chapter 11 Cases").   A detailed description surrounding the facts and circumstances of these Chapter 11 Cases is set forth in the First Day Declaration.

5.     As of the Petition Date, each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code.   The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.  Concurrently with the filing of this motion, the Debtors have requested procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).  No party has requested the appointment of a trustee or examiner in these Chapter 11 Cases, and no committees have been appointed or designated.

## THE STORE CLOSINGS

6.      Over the past several years, the Debtors have faced a challenging commercial environment brought on by the shift away from brick-and-mortar stores, coupled with other industry specific challenges and internal issues, including increased need for capital expenditures and substantially decreased profit margins.  Given the expenses associated with a substantial brick and mortar presence, and the issues affecting the retail industry as a whole, a significant number of the Debtors' stores are operating at sub-optimal performance levels.  Moreover, as set forth in greater detail in the First Day Declaration, on December 5, 2019, American Greetings purported to terminate certain agreements with the Debtors, including the Trademark Agreement and Supply Agreement.  As a result of the purported termination of the American Greetings Agreements, the Debtors' business operations have been adversely affected.  In response to these challenges, the Debtors, intend to complete an orderly liquidation of their assets in a controlled, court-supervised environment (the "Liquidation").[3]

7.      Prior to the Petition Date, the Debtors solicited bids from four (4) leading national liquidation firms.  To initiate the closing of Debtors' store locations in the United States (the "Store Closings"), the Debtors entered into the consulting agreement dated as of January 17, 2020 (the "Consulting Agreement"), by and between the Debtors, as "Merchant" thereunder

---

[3] A Companies' Creditors Arrangement Act ("CCAA") proceeding has been commenced in Canada relating to the Debtors' Canadian affiliate.  By this Motion, the Debtors only seek authority to conduct the Sales (as defined below) in the stores located in the United States.

(the "Merchant"), and a joint venture comprised of Gordon Brothers Retail Partners, LLC ("GB") and Hilco Merchant Resources, LLC ("Hilco" and, together with GB, the "Consultant"), a copy of which is annexed as **Exhibit 1** to the interim order (the "Interim Order") and final order (the "Final Order") attached hereto. The Debtors recognized that each of GB and Hilco is a well-known and reputable firm and recognized their experience in conducting store closings on an expedited timeline. The Debtors' management, in consultation with the Debtors' advisors, ultimately selected and engaged the Consultant to, as set forth in the Consulting Agreement: (a) manage the closing of the Debtors' U.S. retail store locations (the "Closing Stores") through the conduct of "store closing" or other mutually agreed themed sales (the "Sales" and the closing of such Closing Stores, the "Store Closings"); (b) sell all goods located in the Closing Stores on the Sale Commencement Date (as defined in the Consulting Agreement) or delivered thereto after the Sale Commencement Date (the "Merchandise")[4]; (c) sell Debtor owned furnishings, trade fixtures, equipment and improvements to real property located in the Closing Stores and which have **not** been identified to the Consultant by the Debtors as items that may not be sold (the "Offered FF&E"); (d) sell Additional Consultant Goods (as defined in the Consulting Agreement) ((b)-(d), collectively, the "Store Closure Assets");   and (e) otherwise prepare the Closing Stores for turnover to the applicable landlords.

8.     By this motion, the Debtors seek to assume the Consulting Agreement so that the Consultant may continue in its role as Consultant for the Sales on a post-petition basis without interruption. The Debtors have determined, in the exercise of their business judgment, that the continuation of services by the Consultant is necessary for the efficient, large-scale execution of

---

[4] The Debtors are neither selling nor leasing personally identifiable information pursuant to the Motion, although in connection with the Sales, the Consultant will be authorized to distribute emails and promotional materials to the Debtors' customers consistent with the Debtors' existing policies on the use of consumer information—subject to the Debtors' consent on messaging.

the Sales and Store Closings, and to maximize the value of the Store Closure Assets, and any change in or elimination of the Consultant would significantly disrupt the Sale process and impair the value of the remaining Store Closure Assets.

9.      Further, the Store Closings are a critical component of the Debtors' chapter 11 strategy, and assumption of the Consulting Agreement will allow the Debtors to continue to conduct the Sales and Store Closings in an efficient, controlled manner that will maximize value for the Debtors' estates.  The relief requested in this motion is integral to maximizing the value of the Debtors' estates.  It will establish fair and uniform store closing procedures to assist the Debtors and their creditors effectuate their chapter 11 strategy.

**I.      The Consulting Agreement.**

10.     Pursuant to the Consulting Agreement, the Consultant will serve as an independent consultant to the Debtors to conduct the store closing Sales.  Assumption of the Consulting Agreement will allow the Debtors to continue to utilize the logistical capabilities, experience, and resources of the Consultant in performing large-scale liquidations in a format that allows the Debtors to retain control over the process. A summary of the salient terms of the Consulting Agreement is set forth below.[5]

| TERM | CONSULTING AGREEMENT |
|---|---|
| **Services Provided by Consultant** | During the Sale Term, Consultant shall, in collaboration with Merchant:<br><br>• Recommend appropriate discounting to effectively sell all of the goods located at the Stores as of the Sale Commencement Date or thereafter delivered to the Stores (whether from Merchant's existing orders or warehouse goods) by mutual agreement of the Parties, in accordance with a "store closing," "everything must go," "sale on everything" and other mutually agreed upon themed sale, and recommend appropriate point-of-purchase, point-of-sale, and other internal and |

---

[5] The following summary chart is for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Consulting Agreement, the Consulting Agreement shall govern in all respects.  Any capitalized terms used in the summary chart but not defined therein are used as defined in the Consulting Agreement.

| TERM | CONSULTING AGREEMENT |
|---|---|
| | external advertising in connection therewith. |
| | • Provide qualified supervision to oversee the conduct of the Sale. |
| | • Maintain focused and constant communication with Store-level employees and managers to keep them abreast of strategy and timing and to properly effect Store-level communication by Merchant's employees to customers and others about the Sale. |
| | • Establish and monitor accounting functions for the Sale, including evaluation of sales of Merchant's goods located at the Stores by category, sales reporting and expense monitoring, all of which shall be shared with the Merchant's advisors monitoring the Sale. |
| | • Recommend loss prevention strategies. |
| | • Coordinate with Merchant so that the operation of the Stores is being properly maintained including ongoing customer service and housekeeping activities. |
| | • Recommend appropriate staffing levels for the Stores and appropriate bonus and/or incentive programs (to be funded by Merchant) for Store employees. |
| | • Assist Merchant to conduct the Sale as a "store closing" or other mutually agreed upon theme, including by advising Merchant with respect to the permitting requirements of affecting such a Sale in compliance with applicable state and local "going out of business" laws, and/or in the event that Merchant becomes subject to any Insolvency Proceeding, in compliance with any Approval Order. |
| | • Meet with Merchant and its advisors, on at least a weekly basis, to review sales, sales reporting and expenses in an effort to minimize expenses and maximize overall net recovery of the Sale. |
| **Term of Sale** | • The "Sale Term" with respect to each respective Store shall commence on or around January 16, 2020 (such commencement date, the "Sale Commencement Date") and shall end no later than February 29, 2020 (the "Sale Termination Date"); *provided, however*, that Consultant and Merchant may mutually agree upon an earlier or later "Sale Commencement Date" or "Sale Termination Date" with respect to any one or more Stores (on a Store-by-Store basis). |
| **Expenses of Consultant** | • All expenses incident to the conduct of the Sale and the operation of the Stores during the Term (including without limitation all Consultant Controlled Expenses and all other Store-level and corporate expenses associated with the Sale) shall be borne by Merchant; except solely for any of the specifically enumerated "Consultant Controlled Expenses" that exceed the aggregate budgeted amount for all Consultant Controlled Expenses shown on Exhibit B to the Consulting Agreement. |
| | • Regarding the Sale Services, attached as Exhibit B to the Consulting Agreement is an expense budget for the "Consultant Controlled Expenses" to be incurred during the Sale Term. |
| | • Consultant will advance funds for the Consultant's Controlled Expenses, and Merchant shall reimburse Consultant therefor (up to the aggregate budgeted amount |

| TERM | CONSULTING AGREEMENT |
|------|----------------------|
| | and not on a line item basis) in connection with each weekly reconciliation contemplated by Section 5(B) of the Consulting Agreement upon presentation of reasonable documentation for such actually-incurred expenses.   The parties may from time to time mutually agree in writing to increase the budget of Consultant Controlled Expenses based upon circumstances of the Sale, it being acknowledged and agreed that the Merchant will obtain such consent in advance of the occurrence of any such expense by Consultant. <br><br> • In addition to, and not as part of, reimbursement of any Consultant Controlled Expenses, Merchant shall also reimburse Consultant for its reasonable and documented legal fees and expenses incurred in connection with this Agreement. <br><br> • Pursuant to the Consulting Agreement Merchant has advanced to Consultant the sum of $500,000 (the "Special Purpose Payment") to secure all amounts owing to Consultant under the Consulting Agreement. Consultant may apply the Special Purpose Payment to any unpaid obligation owing by the Merchant to the Consultant under the Consulting Agreement. Any portion of the Special Purpose Payment not used to pay amounts owing to Consultant shall be returned to Merchant upon the conclusion of the Sale. |
| **Compensation for Consultant** | • **Merchandise Fees**.   In consideration of its services under the Consulting Agreement, Merchant shall pay Consultant a "Merchandise Fee" based upon one of the following thresholds of Gross Recovery Percentage (e.g., back to first dollar): <br><br> <table><tr><td>Gross Recovery Percentage</td><td>Sale Fee</td></tr><tr><td>Below 190.0%</td><td>1.75% of Gross Proceeds</td></tr><tr><td>Above 190.0%</td><td>2.0% of Gross Proceeds</td></tr></table> <br> • **Non-Merchandise Fee**. Subject to the consent of the owners of the Non-Merchandise Goods, Consultant shall sell Non-Merchandise Goods during the Sale at the Stores, and in consideration of such services, Consultant shall earn a fee equal to the definitive Merchandise Fee percentage earned by Consultant on sales of Merchandise as set forth in Section 4(B) of the Consulting Agreement multiplied by the aggregate gross proceeds, net only of sales taxes, from the sale of Non-Merchandise Goods at the Stores (the "Non-Merchandise Fee"). <br><br> • **FF&E Commission**.   With respect to Offered FF&E sold through the Sale, Consultant shall sell such items on a commission basis, for a commission equal to 15% of the gross proceeds of such Offered FF&E, net only of sales taxes (the "FF&E Commission"). <br><br> • **Gross Rings**. For purposes of calculating Gross Proceeds, Gross Recovery Percentage and the Consultant's Merchandise Fee and Non-Merchandise Fee, the parties shall use the "Gross Rings" method, wherein Consultant and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable sales taxes, and (ii) cash reports of sales within each Store. Register receipts shall show for each item sold the Cost Value and Retail Price (as reflected on Merchant's books and records) for such item, and the markdown or other discount granted in connection with such sale. All such records and reports shall be made available to Consultant |

| TERM | CONSULTING AGREEMENT |
|---|---|
| | and Merchant during regular business hours upon reasonable notice. |
| | • **Weekly Payments**. On a weekly basis in connection with each weekly reconciliation contemplated by Section 5(B) of the Consulting Agreement, Merchant shall pay Consultant an amount equal to 1.75% of Gross Proceeds on account of the prior week's sales as an advance on account of the Merchandise Fee payable hereunder; and (2) any Non-Merchandise Fee and FF&E Commission earned during the prior week. The parties shall determine the definitive Gross Recovery Percentage, Merchandise Fee, Non-Merchandise Fee, and FF&E Commission (and in the case of Merchant, any Additional Consultant Goods Fee, if any), in connection with the Final Reconciliation. Immediately thereafter (and as part of the Final Reconciliation), Merchant or Consultant, as the case may be, shall pay any additional amount owed on account of such fees. |
| **Additional Consultant Goods** | Subject to compliance with applicable law and any Approval Order, Consultant shall have the right, at Consultant's sole expense, to supplement the Merchandise in the Sale with additional goods procured by Consultant which are of like kind, and no lesser quality to the Merchandise in the Sale ("Additional Consultant Goods"), which shall be supplied by Consultant to Merchant on a consignment basis. In consideration of the right to include Additional Consultant Goods in the Sale, Consultant shall pay to Merchant an amount equal to 7.5% of the gross proceeds (net only of sales taxes) of sales of Additional Consultant Goods through the Sale, and Consultant shall retain all remaining amounts from the sale of Additional Consultant Goods. |
| **Merchant and Consultant's Insurance Obligations** | During the Sale Term: (a) Merchant shall maintain (at its expense) insurance with respect to the Merchandise in amounts and on such terms and conditions as are consistent with Merchant's ordinary course operations, and (b) each of Merchant and Consultant shall maintain (at each party's respective expense) comprehensive liability insurance covering injuries to persons and property in or in connection with the Stores, in such amounts as are reasonable and consistent with its ordinary practices, for bodily injury, personal injury and/or property damage. Each party shall be added as an additional insured on all such insurance of the other party, all such insurance shall provide that it shall be non-cancelable and non-changeable except after 30 days' prior written notice to the other party, and each party shall provide the other with certificates of all such insurance prior to the commencement of the Sale. |
| **Indemnification by Consultant** | Consultant shall indemnify and hold Merchant and its affiliates, and their respective officers, directors, managers, employees, consultants, and independent contractors (collectively, "Merchant Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: |
| | • Consultant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith; |
| | • any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Merchant by Consultant, its affiliates or their respective officers, directors, employees, agents, independent contractors or representatives (including without limitation any supervisors); |
| | • any claims by any party engaged by Consultant as an employee or independent |

| TERM | CONSULTING AGREEMENT |
|---|---|
| | contractor (including without limitation any non-Merchant employee supervisor) arising out of such employment or engagement; <br><br> • any consumer warranty or products liability claims relating to any Additional Consultant Goods; and/or <br><br> • the negligence, willful misconduct or unlawful acts of Consultant, its affiliates or their respective officers, directors, employees, Consultants, independent contractors or representatives, *provided that* Consultant shall not be obligated to indemnify any Merchant Indemnified Party from or against any claims, demands, penalties, losses, liabilities or damages arising primarily from any Merchant Indemnified Party's gross negligence, willful misconduct, or unlawful act. |
| **Indemnification by Merchant** | Merchant shall indemnify and hold Consultant, its affiliates and their respective officers, directors, employees, consultants, and independent contractors (collectively, "Consultant Indemnified Parties") harmless from and against all third-party claims, demands, penalties, losses, liability or damages, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: <br><br> • Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith; <br><br> • if applicable, any proceedings before the Court or any other court of competent jurisdiction regarding this Agreement, including obtaining the Approval Order and/or defending against any objection thereto; <br><br> • any claims by any party engaged by Merchant as an employee or independent contractor arising out of or in relation to such agreement or the termination thereof; <br><br> • any consumer warranty or products liability claims relating to any Merchandise; and/or <br><br> • any claims in respect of rent or other occupancy costs or charges relating to any Store or other premises; <br><br> • any claims resulting from the failure of Merchant to report, collect, remit or pay in accordance with applicable law any sales or other taxes relating to the Sale; and/or <br><br> • the negligence, willful misconduct or unlawful acts of Merchant, its affiliates or their respective officers, directors, employees, agents, independent contractors or representatives, *provided that* Merchant shall not be obligated to indemnify any Consultant Indemnified Party from or against any claims, demands, penalties, losses, liabilities or damages arising primarily from any Consultant Indemnified Party's gross negligence, willful misconduct, or unlawful act. |

## II.    The Store Closing Procedures.

11.    The Debtors seek approval of streamlined procedures (*i.e.*, the Store Closing Procedures) to sell the Store Closure Assets, in each case free and clear of liens, claims, and encumbrances.  The Debtors also seek approval of the Store Closing Procedures to provide newspapers and other advertising media in which the Sales may be advertised with comfort that the Debtors are conducting the Sales in compliance with applicable law and with the Court's approval.

12.    The Debtors have determined, in the exercise of their business judgment and in consultation with their advisors, that the Store Closing Procedures will provide the best, most efficient, and most organized means of selling the Store Closure Assets to maximize their value to the estates.  The Debtors estimate that the Store Closings will be completed on or before February 29, 2020.

## III.    Liquidation Sale Laws and Dispute Resolution Procedures.

13.    Certain states in which the Debtors operate Closing Stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including, without limitation, state, provincial, and local laws, statutes, rules, regulations, and ordinances (the "Liquidation Sale Laws").  Liquidation Sale Laws may establish licensing, permitting, or bonding requirements, waiting periods, time limits, and bulk sale restrictions and augmentation limitations that would otherwise apply to the Store Closings. Such requirements hamper the Debtors' ability to maximize value in selling their inventory. Consequently, the Debtors request the Court's approval of the Store Closings and conduct of the Sales in accordance with the Store Closing Procedures, notwithstanding the requirements of the Liquidation Sale Laws, and to the extent the Store Closing Procedures conflict with the Liquidation Sale Laws, the Store Closing Procedures shall control.

14.    To facilitate the orderly resolution of any disputes between the Debtors and any

Governmental Units (as defined in section 101(27) of the Bankruptcy Code) arising due to the

Store Closing Procedures and the alleged applicability of any Liquidation Sale Laws, the Debtors

respectfully request that the Court authorize the Debtors to implement the following dispute

resolution procedures (the "Dispute Resolution Procedures"), on an interim and final basis:

a.    Provided that the Sales are conducted in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures, and in light of the provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, the Debtors and the Consultant will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Sales in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures without the necessity of further showing compliance with any such Liquidation Sale Laws.

b.    Within two (2) business days after entry of the Interim Order, the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order, the proposed Final Order, the Consulting Agreement, and the Store Closing Procedures on the following:  (i) the landlords for the Closing Stores; (ii) the Attorney General's office for each state in which the Sales are being held; (iii) the county consumer protection agency or similar agency for each county in which the Sales are being held; and (iv) the division of consumer protection for each state in which the Sales are being held (collectively, the "Dispute Notice Parties").

c.    To the extent that there is a dispute arising from or relating to the Sales, the Interim Order, or the proposed Final Order, as applicable, the Consulting Agreement, or the Store Closing Procedures, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute.  Any time within ten (10) days following entry of the Interim Order, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to: (i) the Debtors, Schurman Retail Group, LLC, 300 Oak Bluff Lane, Goodlettsville, Tennessee 37072, Attn: Craig M. Boucher, Cboucher@mackinacpartners.com; (ii) proposed counsel to the Debtors, Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, Delaware 19801, Attn: Adam G. Landis, landis@lrclaw.com and Matthew B. McGuire, mcguire@lrclaw.com; (iii) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Juliet M. Sarkessian, Juliet.m.sarkessian@usdoj.gov;  (iv) counsel to the Senior

Agent, Riemer & Braunstein LLP, 100 Cambridge Street, 22ⁿᵈ Fl., Boston, MA 02114, Attn: Donald E. Rothman, drothman@riemerlaw.com; and Womble Bond Dickinson (US) LLP, 313 North Market Street, Suite 1200, Wilmington, DE 19801, Attn: Matthew P. Ward, matthew.ward@wbd-us.com; (v) counsel to any statutory committee appointed in these Chapter 11 Cases; and (vi) counsel to the Consultant, Greenberg Traurig, LLP, One International Place, Suite 200, Boston, MA 02110, Attn: Jeffrey M. Wolf, wolfje@gtlaw.com. If the Debtors, the Consultant, and the Governmental Unit are unable to resolve the Reserved Dispute within 14 days after service of the Dispute Notice, the Governmental Unit may file a motion with the Court requesting that the Court resolve the Reserved Dispute (a "<u>Dispute Resolution Motion</u>").

d.  In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors or any other interested party from asserting (i) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (ii) that neither the terms of the Interim Order or the Final Order nor the conduct of the Debtors pursuant to the Interim Order or the Final Order violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or the Final Order or to limit or interfere with the Debtors' or the Consultant's ability to conduct or to continue to conduct the Sales pursuant to the Interim Order or the Final Order, absent further order of the Court. Upon the entry of the Interim Order or the Final Order, as applicable, the Court grants authority for the Debtors and the Consultant to conduct the Sales pursuant to the terms of the Interim Order or the Final Order, as applicable, the Consulting Agreement, and/or the Store Closing Procedures and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

e.  If, at any time, a dispute arises between the Debtors and/or the Consultant and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (c) and (d) above by serving a notice to the other party and proceeding thereunder in accordance with those subparagraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

## IV.    Fast Pay Laws.

15.    Many states in which the Debtors operate have laws and regulations that require the Debtors to pay an employee substantially contemporaneously with his or her termination (the "Fast Pay Laws" and, together with the Liquidation Sale Laws, the "Applicable State Laws").  These laws often require payment to occur immediately or within a period of only a few days from the date such employee is terminated.

16.    The nature of the Store Closings contemplated by this Motion will result in a substantial number of employees being terminated at or near the end of the Store Closings.   To be clear, the Debtors intend to pay their terminated employees as expeditiously as possible, under normal payment procedures, and pursuant to applicable Court order.[6]  However, the Debtors' payroll systems will simply be unable to process the payroll information associated with these terminations in a manner that will be compliant with the Fast Pay Laws.   Under ordinary circumstances, the Debtors' payroll department is able to coordinate delivery of final checks to coincide with an employee's final day of work where required by state law.   This process requires the Debtors' payroll department to calculate individual termination payments, prepare each termination payment check, obtain authorization for each such check, and then prepare each such check for mailing. Given the number of employees who will likely be terminated in connection with the Store Closings, this process could easily take several days, making compliance with the Fast Pay Laws burdensome to the Debtors' estates, if not impossible.

---

[6] The Debtors are seeking such relief pursuant to the *Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Wages, Compensation, Employee Benefits and Other Associated Obligations*, filed contemporaneously herewith.

## V.      Lease Restrictions.

17.      The Debtors also respectfully request a waiver of any contractual restrictions that could otherwise inhibit or prevent the Debtors from maximizing value for creditors through the Store Closings and conduct of the Sales.  In certain cases, the contemplated Store Closings and Sales may be inconsistent with certain provisions of leases, subleases, or other documents with respect to the premises in which the Debtors operate, including, without limitation, reciprocal easement agreements, agreements containing covenants, conditions, and restrictions (including, without limitation, "go dark" provisions and landlord recapture rights), or other similar documents or provisions.  Such restrictions would also hamper the Debtors' ability to maximize value in selling their inventory.

18.      The Debtors also request that no entity, including, without limitation, landlords, licensors, property owners, property managers, shopping center managers, service providers, utilities, personnel, or creditors, and all persons acting for or on their behalf, shall interfere with or otherwise impede the conduct of the Store Closings, the Sales, or institute any action against the Debtors or the Consultant in any court (other than this Court) or before any administrative body that in any way directly or indirectly interferes with, obstructs, or otherwise impedes the conduct of the Store Closings, the Sales, or the advertising and promotion (including through the posting of signs) of the Sales.  In connection with lease restrictions, the Debtors also seek authority to enter agreements ("Side Letters") between themselves and/or the Consultant and the landlords of the Closing Stores modifying the Store Closing Procedures.

## VI.     The Store Bonus Program.

19.      The Debtors seek authorization to implement the Store Bonus Program and make payments thereunder to Store Bonus Program participants, all of whom are non-insiders, to ensure successful consummation of the Store Closings.  Specifically, the Debtors request

authority, at their discretion, to provide additional compensation in an amount up to $150,000 in bonuses (the "Store Bonuses") for the store managers and assistant managers to incentivize these employees to complete the Store Closings. The Consultant will make recommendations to the Debtors with respect to the amount of each Store Bonus and the Debtors will pay such bonuses upon the employee's termination. For the avoidance of doubt, none of the employees eligible for the Store Bonuses are "insiders" of the Debtors, nor will any employee holding the title of an officer receive a Store Bonus.

20.      The success of the Store Closings and the Sales depends on store-level employees continuing their ordinary course duties under the supervision of the Consultant and the Debtors. Store employees are necessary to, among other things, service customers, administer in-store sales, and manage cash receipts and bank deposits. Replacing such employees would be unfeasible under the contemplated timeframe for the Store Closings. Through the employees' ongoing commitment and performance, they can ensure that the Debtors continue to maximize stakeholder value in a challenging economic environment and at a time when those employees' positions will soon be terminated. The Store Bonus Program is a necessary component of the Store Closings and the Sales and has the support of the Senior Agent and Senior Lenders.

## **RELIEF REQUESTED**

21.      The Debtors seek entry of an Interim Order and Final Order, substantially in the forms attached hereto: (a) authorizing the Debtors to assume the Consulting Agreement; (b) authorizing the Store Closings and conduct of the Sales with such Store Closings and Sales to be in accordance with the terms of the store closing procedures (the "Store Closing Procedures"), annexed as **Exhibit 2** to the Interim Order and Final Order; (c) approving the implementation of an employee bonus program (the "Store Bonus Program") and authorizing payments thereunder to certain non-insider employees; and (d) granting related relief.

22.     In addition, the Debtors request that the Court schedule a final hearing within approximately 21 days of the commencement of these Chapter 11 Cases to consider approval of this Motion on a final basis.

## BASIS FOR RELIEF

**I.      The Court Should Authorize the Assumption of the Consulting Agreement.**

23.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See, e.g.*, *In re HQ Glob. Holdings. Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject an executory contract is governed by the business judgment standard and it can only be overturned if the decision was a product of bad faith, whim or caprice); *see also In re Market Square Inn. Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

24.     The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp, v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).  Any more exacting scrutiny would slow the administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.  *See Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1985).

25.     The assumption of the Consulting Agreement is beneficial to the Debtors' estates, and, therefore, is a reasonable exercise of the Debtors' business judgment. In consultation with its advisors, the Debtors have determined that the Closing Stores are a burden to these estates, and the Store Closure Assets should be liquidated for the benefit of the Debtors' estates and their creditors. Further, after a thorough marketing process, the Debtors determined that entering into the Consulting Agreement would provide the greatest return to the Debtors' estates for the Store Closure Assets. The Debtors evaluated bids from two (2) other national liquidation firms prepetition before selecting the Consultant, and the terms set forth in the Consulting Agreement are the best alternative for the conduct of the Store Closings and Sales. The terms of the Consulting Agreement are the results of arm's length bargaining and are the best terms available to the Debtors, as tested through a reasonable marketing process.

26.     The Consultant has extensive expertise in conducting liquidation sales and can oversee and assist in the management and implementation of, the Store Closings and Sales in an efficient and cost-effective manner. Assumption of the Consulting Agreement will enable the Debtors to utilize the skills and resources of the Consultant to effectively and efficiently conduct the Store Closing and Sales for the benefit of all stakeholders. Given the number of stores and the particular issues in administering the Store Closing and Sales, as discussed above, it is not certain the Debtors could retain a liquidator able to conduct the process as efficiently and effectively as the Consultant. If the Consulting Agreement is not assumed on an interim basis, the Sales would lose the benefit of the Consultant's oversight and might be delayed or suspended entirely, leading to loss of additional liquidity and increased administrative expenses. For example, the Debtors estimate that the aggregate monthly payroll of the Closing Stores is approximately $1.1 million. If the Consulting Agreement is not assumed and the Sales are not

authorized on an interim basis pursuant to the Interim Order, the potential loss from ongoing payroll expenses alone could be over $275,000 for each week the Sales, and in turn, the Store Closings, are delayed.

## II.    The Debtors Have a Valid Business Justification for the Sales.

27.    Section 363(b)(1) of the Bankruptcy Code, which governs asset sales outside of a debtor's ordinary course of business, provides that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  When selling assets outside of the ordinary course of business, a debtor must articulate a valid business justification to obtain court approval.  *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citation omitted); *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp*, and requiring good faith); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983); *In re Delaware & Hudson Ry, Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision).  When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11, especially where the debtor is a Delaware corporation (quotations omitted)).

28.    Store closing or liquidation sales are a routine occurrence in chapter 11 cases involving retail debtors.  *See Ames Dept. Stores*, 136 B.R. at 359 (noting that liquidation sales are an important part of "overriding federal policy requiring [a] Debtor to maximize estate

assets"). As such, bankruptcy courts in this jurisdiction have approved similar store closing sales. *See, e.g.*, *In re Destination Maternity Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019) (authorizing procedures for store closing sales); *In re Avenue Stores, LLC*, No. 19-11842 (LSS) (Bankr. D. Del. Sept. 13, 2019) (same); *In re Charming Charlie Holdings, Inc.*, No. 19-11534 (CSS) (Bankr. D. Del. Aug. 14, 2019) (same); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 28, 2019) (same); *In re Charming Charlie Holdings Inc.*, No. 17-12906 (CSS) (Bankr. D. Del. Jan. 10, 2018) (same).[7]

29.     Sufficient business justification exists to approve the proposed Sales under section 363(b)(1). The Debtors, with the assistance of their advisors, have determined that the Sales represent the best alternative to maximize recoveries to the Debtors' estates with respect to the Store Closure Assets and provide the Debtors with much-needed liquidity. There are meaningful amounts of Merchandise, in the aggregate, that will be monetized most efficiently and quickly through an orderly process conducted in consultation with an experienced liquidation firm. Further, delay in commencing the Sales would diminish the recovery tied to monetization of the Store Closure Assets for several important reasons. Many of the Closing Stores fail to generate positive cash flow and therefore are a significant drain on liquidity. As such, the Debtors will realize an immediate benefit in terms of financial liquidity upon the sale of the Store Closure Assets and the termination of operations at such Closing Stores. Further, uninterrupted and orderly Sales will allow the Debtors to timely reject leases associated with the Closing Stores and, therefore, avoid the accrual of unnecessary administrative expenses for rent

---

[7] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

and related costs.[8]  Suspension of the Sales until entry of the Final Order may cause the Debtors to incur claims for rent at many of these stores, at a possible cost to the estate of up to $2.4 million each month, which the Debtors could be required to pay in full.

### III.    The Debtors Have a Valid Business Justification for the Store Bonus Program.

30.    Under the circumstances of these Chapter 11 Cases, the implementation of the Store Bonus Program is a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors' and all their estates' stakeholders.   The Debtors believe the Store Bonuses are necessary to sustain employee morale and facilitate the Store Closings during these Chapter 11 Cases.  Absent the Store Bonuses, the Debtors are likely to lose key store personnel that are critical to administering final sales of merchandise.

31.    The flight risk of store employees is particularly acute under the circumstances here since the Debtors' are seeking to undergo complete Liquidation.  Such departures would jeopardize the Store Closing process by requiring the Debtors to find new employees and train them.  The Store Bonuses are purposed to mitigate flight risk by incentivizing and rewarding store employees for staying with the Debtors through the Store Closing process.

32.    If the Debtors are not able to keep their store employees and motivate them through the Store Closings, the Debtors will realize less value to the detriment of the Debtors' creditors.  The potential loss to the estate if employees are not retained through the Store Closing process far outweighs the cost of the Store Bonus Program, which is reasonable in light of competitive market practices.  The maximum cost of the Store Bonus Program is less than one percent of gross annual payroll for store employees and is similar to the amounts used in other

---

[8] The Debtors will reject leases of Closing Stores in accordance with procedures that will be set forth in the rejection procedures motion filed contemporaneously herewith.

restructuring situations to incentivize employees to continue optimal performance despite the added stress inherent in the chapter 11 process. *See, e.g.*, *In re Destination Maternity Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019) (authorizing up to $350,000 in store closing bonus plans); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (authorizing up to $500,000 in store closing bonus plans); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 28, 2019) (authorizing a $1600 per store bonus for the store managers and assistant managers to incentivize employees to complete store closings); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 7, 2018) (authorizing discretionary bonus payments in an amount no more than 10 percent of payroll for store employees); *In re Golfsmith Int'l Holdings, Inc.*, No. 16-12033 (LSS) (Bankr. D. Del. Oct. 13, 2016) (authorizing store closing bonuses up to 1.5% of gross annual payroll for closing stores); *In re Quicksilver, Inc.*, No. 15-11880 (BLS) (Bankr. D. Del. Sept. 10, 2015) (approving store closing bonuses up to 10% of base payroll for all employees working at the closing stores).

33.     The Store Bonus Program is comparable to employee incentive plans regularly paid as "expenses of sale" by liquidating agents in other "store closing" and similar-themed sales. As such, courts have approved incentive payments similar to those contemplated in the Store Bonus Program. *See, e.g.*, *In re Destination Maternity Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019) (authorizing customary store closing retention bonus program to non-insider employees who remain employed for the store closing process); *In re Z Gallerie*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 28, 2019) (same); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 7, 2018) (same); *In re Golfsmith Int'l Holdings, Inc.*, No. 16-12033 (LSS) (Bankr. D. Del. Oct. 13, 2016) (same).

34.     Accordingly, the Debtors submit that the relief requested with respect to the Store Bonus Program is a valid exercise of the Debtors' business judgment and the approval of the Store Bonus Program is appropriate under section 363 of the Bankruptcy Code and is in the best interests of the Debtors, their estates, and all parties in interest in these Chapter 11 Cases.

**IV.     The Court Should Approve the Sale of the Store Closure Assets Free and Clear of all Liens, Encumbrances, and Other Interests Under Bankruptcy Code Section 363(f).**

35.     The Debtors request approval to sell the Store Closure Assets on a final "as is" basis, free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code.    A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:  (a) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (b) such entity consents; (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (d) such interest is in bona fide dispute; or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f); *see also Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met).  Moreover, the Third Circuit has indicated that a debtor possesses broad authority to sell assets free and clear of liens. *See In re TWA Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

36.     Although the term "any interest" is not defined in the Bankruptcy Code, the Third Circuit has noted that the trend in modern cases is toward "a broader interpretation which includes other obligations that may flow from ownership of the property." *Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 258–59 (3d Cir. 2000).  As the Fourth

Circuit held in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581–82 (4th Cir. 1996) (cited with approval by the Third Circuit in *Folger Adam*), the scope of section 363(f) is not limited to *in rem* interests in a debtor's assets.  Thus, a debtor can sell its assets under section 363(f) "free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

37.     With respect to any other party asserting a lien, claim, or encumbrance against the Store Closure Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f).   The Store Closure Assets (except the Additional Consultant Goods and the Additional Consultant Goods proceeds, excluding the portion thereof attributable to the Additional Consultant Goods Fee) constitute the collateral of the Debtors' senior secured prepetition lender, Wells Fargo Bank, National Association (the "Senior Lender"), who holds perfected senior liens upon and security interests in the Store Closure Assets, among other things. The Senior Lender consents to the Debtors' conduct of the Store Closings and Sales, as well as the engagement of the Consultant and assumption of the Consulting Agreement, subject to the condition that the proceeds realized from the disposition of the Store Closure Assets be paid over to the Senior Lender in partial satisfaction of any indebtedness and other obligations owing to the Senior Lender under the parties' prepetition loan and other documents (the "Prepetition Debt"), all in accordance with the terms of an interim cash collateral order to be presented to the Court contemporaneously with this Motion.[9] The Debtors propose that any other liens, claims, and encumbrances asserted against the Store Closure Assets or the proceeds

---

[9] The payment of the Sale proceeds in partial satisfaction of the Prepetition Debt owing to the Senior Lender shall be subject to any "challenge" provisions contained in any interim and/or final cash collateral order that may be entered in these cases.

therefrom be transferred to and attach to the amounts earned by the Debtors under the Sales with the same force, effect, and priority as such liens currently have on the Store Closure Assets.

**V.     The Court Should Waive Compliance with Applicable State Laws and Approve the Dispute Resolution Procedures.**

38.     The Debtors' ability to conduct the Sales in accordance with the Store Closing Procedures and without strict compliance with all Applicable State Laws is critical to the Sales' success.  Although the Debtors intend to comply with state and local health and safety laws and consumer protection laws in conducting the Sales, many Liquidation Sale Laws require special and cumbersome licenses, waiting periods, time limits, and other procedures for store closing, liquidation, or similar sales.  Additionally, compliance with Fast Pay Laws would require the Debtors to pay terminated employees within a time frame that would be detrimental to the conduct of these Chapter 11 Cases, if not impossible.

39.     To eliminate the time, delay, and expense associated with the administrative procedures necessary to comply with the Applicable State Laws, the Debtors propose the Store Closing Procedures as a way to streamline the administrative burdens on their estates while still adequately protecting the broad and varied interests of both landlords and applicable governmental agencies charged with enforcing any Liquidation Sale Laws that may apply to the Store Closings.  As such, the Debtors believe the Store Closing Procedures mitigate any concerns that their landlords or governmental agencies may raise with respect to the Store Closings and, therefore, the requested relief is in compliance with any applicable Liquidation Sale Laws.

40.     The Debtors submit that there is strong support for granting them the authority to not comply with the Liquidation Sale Laws.  *First*, it is generally accepted that many state statutes and regulations provide that, if a liquidation or bankruptcy sale is court-authorized, a company need not comply with the Liquidation Sale Laws.  *See, e.g.*, Ark. Code Ann.

§ 4-74-103 (exempting from the provisions of the chapter sales pursuant to any court order); Fla. Stat. Ann. 559.25(2) (same); Ga. Code Ann. § 10-1-393(b)(24)(C)(iv) (same); 815 ILCS 350/3 (same); La. Rev. Stat. Ann. § 51:43(1) (same); N.Y. Gen. Bus. Law § 584(a) (same); Or. Rev. Stat. Ann. § 646A.100(2)(b) ("'Going out of business sale' does not include a sale conducted by a bankruptcy trustee."); Tex. Bus. & Com. Code Ann. § 17.91(3) (exempting from subchapter sales conducted pursuant to court order). *Second*, pursuant to section 105(a) of the Bankruptcy Code, the Court has the authority to permit the Store Closings to proceed notwithstanding contrary Applicable State Laws as it is essential to the continued operation of the Debtors' business. *Third*, this Court will be able to supervise the Store Closings because the Debtors and their assets are subject to this Court's exclusive jurisdiction. *See* 28 U.S.C. § 1334. As such, creditors and the public interest are adequately protected by notice of this motion and the ongoing jurisdiction and supervision of the Court because the Debtors are only seeking interim relief at the outset of these cases, and parties in interest will be able to raise any further issues at the final hearing.

41.    Further, bankruptcy courts have consistently recognized, with limited exception, that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code. *See Belculfine v. Aloe (In re Shenango Group. Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . . [A] state statute . . . cannot place burdens on [a debtor] where the result would contradict the priorities established by the federal bankruptcy code."), *aff'd*, 112 F.3d 633 (3d Cir. 1997).

42.    Courts in some jurisdictions have found that preemption of state law is not appropriate if the laws deal with public health and safety. *See Baker & Drake. Inc. v. Pub. Serv.*

*Comm'n of Nev. (In re Baker & Drake. Inc.)*, 35 F.3d 1348, 1353–54 (9th Cir. 1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure). However, preemption is appropriate where, as is the case here, the only state laws involved concern economic regulation rather than the protection of public health and safety. *See In re Baker & Drake. Inc.*, 35 F.3d at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

43.    Under the circumstances of these Chapter 11 Cases, enforcing the strict requirements of the Liquidation Sale Laws would undermine the fundamental purpose of section 363(b) of the Bankruptcy Code by placing constraints on the Debtors' ability to maximize estate assets for the benefit of creditors. Accordingly, authorizing the Sales without the delays and burdens associated with obtaining various state and local licenses, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising and similar items is necessary and appropriate. The Debtors do not seek a general waiver of all state and local law requirements, but only those that apply specifically to retail liquidation sales. Indeed, the requested waiver is narrowly tailored to facilitate the successful consummation of the Sales. Moreover, with the exception of the limited waivers and accommodations requested herein, the Debtors will comply with applicable state and local public health and safety laws, and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising. Finally, the Dispute Resolution Procedures provide an ordered means for resolving any disputes arising between the Debtors and/or the Consultant and any Governmental Units with respect to the applicability of any Liquidation Sale Laws and should therefore be approved.

44.     Further, courts in this district have recognized that the Bankruptcy Code preempts certain state laws and have granted relief similar to that requested herein. *See, e.g.*, *See, e.g.*, *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (authorizing debtors to conduct store closing sales under the terms of the order and finding that "no further approval, license, or permit of any Governmental Unit shall be required"); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 28, 2019) (same); *In re Charming Charlie Holdings Inc.*, No. 17-12906 (CSS) (Bankr. D. Del. Jan. 10, 2018) (same); *In re Coldwater Creek*, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (stating that debtors were authorized to conduct store closing sales under the terms of the order "without the necessity of further showing compliance" with liquidation laws); *In re Boscov's*, Case No. 08-11637 (KG) (Bankr. D. Del. Aug. 15, 2008) (ordering that "[g]overnmental units shall not fine, assess or otherwise penalize Debtors or Consultant (or any of the landlords of the Closing Stores) for conducting or advertising the Sales in a manner inconsistent with Liquidation Sales Laws, provided that the Sales are conducted and advertised in compliance with this Order").

45.     Courts in this district have also granted similar relief from Fast Pay Laws in other bankruptcy cases under similar circumstances. *See, e.g.*, *In re Destination Maternity Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019) (granting relief from federal, state, or local laws including "any fast pay laws" in connection with store closing sales); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 28, 2019) (same); *In re Charming Charlie Holdings, Inc.*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 13, 2017); *In re Golfsmith Int'l Holdings, Inc.*, No. 16-12033 (Bankr. D. Del. Oct. 13, 2016) (same); *In re Vestis Retail Grp, LLC*, No. 16-10971 (LSS) (Bankr. D. Del. May 16, 2016) (same).

## VI.    The Court Should Waive Compliance with Any Restriction in the Leases.

46.    Certain of the Debtors' leases governing the premises of the stores subject to any Sales may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing, liquidation, or similar sales.   Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code.   *See Ames Dep't Stores*, 136 B.R. at 359 (deciding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets. . . ."); *In re R. H. Macy and Co., Inc.*, 170 B.R. 69, 73-74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to remain open throughout the lease term, because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467-68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct a liquidation sale).

47.    The courts in this district have held that restrictive lease provisions affecting store liquidation sales in chapter 11 cases are unenforceable.   *See, e.g., In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (ordering that store closing sales be conducted without the further need for compliance with, among other things, lease provisions); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 28, 2019) (same); *In re Charming Charlie Holdings Inc.*, No. 17-12906 (CSS) (Bankr. D. Del. Jan. 10, 2018); *In re Coldwater*

*Creek*, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (same); *In re Boscov's*, No. 08-11637 (KG) (Bankr. D. Del. Aug. 15, 2008) (same).

48.     Thus, to the extent that such provisions or restrictions exist in any of the leases of the stores subject to the Store Closings, the Debtors request that the Court authorize the Debtors and/or the Consultant to conduct the Sales and Store Closings without reference to any such restrictive provisions or interference by any landlords or other persons affected, directly or indirectly, by the Sales.  In addition, the Debtors seek the authority to enter into Side Letters between themselves and/or the Consultant and landlords of Closing Stores in order to modify the Store Closing Procedures without the need for further order of the Court.

### VII.    The Court Should Approve the Abandonment of Certain Property In Connection with Any Liquidation Sales.

49.     After notice and a hearing, a debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. §554(a); *see also Hanover Ins. Co. v. Tyco Indus., Inc.*, 500 F.2d 654, 657 (3d Cir. 1974) (stating that a trustee "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim").

50.     The Debtors are seeking to sell all Offered FF&E remaining in the Closing Stores. However, the Debtors may determine that the costs associated with holding or selling certain property or owned furnishings, trade fixtures, equipment and improvements to real property that are located in the Closing Stores (collectively, the "FF&E") exceeds the proceeds that will be realized upon its sale or that such property is not salable at all.  In such event, the property is of inconsequential value and benefit to the estates and/or may be burdensome to retain.

51.     To maximize the value of the Debtors' assets and to minimize the costs to the estates, the Debtors respectfully request authority to abandon any of their remaining FF&E or

other property located at any of the Closing Stores without incurring liability to any person or entity. The Debtors further request that the landlord of each Closing Store with any abandoned FF&E or other property be authorized to dispose of such property without liability to any third parties.

52.     Notwithstanding the foregoing, the Debtors will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information that, alone or in conjunction with other information, identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtors' hardware, software, computers, or cash registers or similar equipment that are to be sold or abandoned.

### THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

53.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. For the reasons discussed above, authorizing the Debtors to assume the Consulting Agreement, approving store closing or similar themed sales in accordance with the Store Closing Procedures and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these Chapter 11 Cases smoothly. Failure to receive such authorization and other relief during the first 21 days of these Chapter 11 Cases would severely disrupt the Debtors' operations at this critical juncture. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## WAIVER OF BANKRUPTCY RULES 6004(A) AND 6004(H)

54.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

55.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to any order granting the relief requested by this Motion is intended or should be construed as, except with respect to the Consultant or the Consulting Agreement:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

## NOTICE AND NO PRIOR REQUEST

56.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances.   Without limiting the foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including:  (a) the U.S. Trustee for the District of Delaware;  (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Senior Agent; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the state attorneys general for states in which the Debtors conduct business; (g) the county consumer protection agency or similar agency for each county where the Sales are being held; (h) the division of consumer protection for each state where the Sales are being held; (i) the landlords of the Closing Stores; (j) sublessees, licensees, or concessionaries of Merchant's goods and owners of goods held by Merchant on memo, consignment, or as bailee located at the Stores; (k) all parties who are known by the Debtors to assert liens against the Store Closure Assets; (l) municipalities in which the Store Closure Assets are located; (m) the Subordinated Creditor; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

57.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter Interim and Final Orders, substantially in the forms attached hereto respectfully, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Dated: January 23, 2020  
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)  
Matthew B. McGuire (No. 4366)  
Nicolas E. Jenner (No. 6554)  
919 Market Street, Suite 1800  
Wilmington, Delaware 19801  
Telephone: (302) 467-4400  
Facsimile: (302) 467-4450  
Email: landis@lrclaw.com  
      mcguire@lrclaw.com  
      jenner@lrclaw.com

*Proposed Counsel to the Debtors*  
*and Debtors-In-Possession*